# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 17-418V**
**Filed: July 20, 2018**
PUBLISHED

| | |
|---|---|
| HEEWON KIM,<br><br>      Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Special Processing Unit (SPU);<br>Damages Decision; Pain and<br>Suffering; Influenza (Flu) Vaccine;<br>Shoulder Injury Related to Vaccine<br>Administration (SIRVA) |

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Colleen Clemons Hartley, U.S. Department of Justice, Washington, DC, for respondent.*

### DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

  On March 24, 2017, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered left shoulder injuries related to administration of her October 14, 2015 influenza ("flu") vaccination. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters and the undersigned now awards damages for petitioner's vaccine-related injury as set forth below.

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.    Procedural History

On November 27, 2017, a ruling on entitlement was issued finding petitioner entitled to compensation for a SIRVA.  (ECF No. 22.)  Petitioner had previously submitted a damages demand to respondent in anticipation of respondent's concession (ECF No. 19) and the parties engaged in damages negotiations from November 2017 until January 2018, at which point petitioner reported that further negotiations would be futile and requested an opportunity to have damages decided by the undersigned on the written record (ECF No. 26).  The undersigned required the parties to confer with regard to the possibility of pursuing mediation, but respondent was not amenable to mediation. (ECF No. 29.)

Petitioner subsequently filed an affidavit with regard to her damages (ECF No. 31) and the parties submitted a joint status report confirming that they had agreed that petitioner is entitled to $520.00 for past unreimbursable expenses. (ECF No. 32.) Petitioner confirmed that she is not seeking compensation for projected expenses or for past or future lost wages. (*Id.*) Petitioner also previously confirmed that there is no Medicaid lien in this case. (ECF No. 19.)

Petitioner filed a brief with regard to the amount of compensation appropriate for petitioner's pain and suffering on May 14, 2018, and respondent filed a responsive brief on June 13, 2018. (ECF Nos. 33-34.)  Petitioner allowed her deadline for filing a reply brief to expire without any further filing.  Accordingly, this case is now ripe for resolution by the undersigned.

## II.    Factual History

Petitioner received her injury-causing influenza vaccination on October 14, 2015. (Ex. 1, p. 7; Ex. 7, pp. 1-2.)  At that time she was a 38 year old stay-at-home parent with a three month old child. (Ex 3, p. 7; Ex. 9.)  She had no history of prior left shoulder problems. (Ex. 3, p. 7.)  On November 24, 2015, petitioner presented for a chiropractic consultation at William Street Sports & Spine.[3] (Ex. 2, pp. 13-4.)  Her chief complaint was "left side cervical-brachial pain." (Ex. 2, p. 3.)  The history indicates that:

> Patient reports receiving a flu vaccination on October 14, 2015 and symptoms began promptly the next day. A sharp pain is located at the left deltoid and radiates diffusely into the left upper trapezius. The patient reports significant pain with any and all movement of the left arm. Pain is rated at 7-8 on a 1-10 pain scale. The patient denies any paresthesias into the upper extremity.

(*Id.*)

---

[3] Respondent notes that in the intervening period, petitioner sought treatment from her OBGYN on October 29, 2015, for an unrelated condition and that there is no mention of any shoulder injury in that record. (ECF No. 34, p. 2, n. 2 (citing Ex. 6, p. 41).)

Upon examination, petitioner demonstrated "severe tenderness" at the insertion of the supraspinatus tendon of the left shoulder.  (*Id.*)  In addition to pain, she had a reduced range of motion of up to 40%. (*Id.*) Petitioner received therapeutic treatment during the consultation and six weeks of twice-weekly follow up was recommended.[4] (Ex. 2, p. 4.)  A home exercise program was also recommended. (*Id.*)

There is no evidence in the record to suggest that petitioner pursued the recommended chiropractic follow up or utilized the home exercise plan recommended by the chiropractor.[5]  Petitioner did not return for further treatment of her shoulder injury until three months later when she was seen by Dr. John Reilly for an orthopedic evaluation on March 2, 2016. (Ex. 3, pp. 7-8.)

At her March 2, 2016 orthopedic evaluation, petitioner reported that "[b]ack in October, she had a flu shot at a drug store and had some pain immediately and has had some pain since then and has been having increased difficulty moving the arm. It is dull, sharp pain, a little more at night.  It is 10/10." (Ex. 3, p. 7.)  On examination, "marked restrictions in rotation and elevation" were noted. (*Id.*) X-ray imaging was normal. (*Id.*) Petitioner received a diagnosis of adhesive capsulitis (frozen shoulder) and was prescribed Meloxicam or Mobic, a non-steroidal anti-inflammatory.  (Ex. 3, p. 7; Ex. 1, p. 7.)  She was also referred to occupational therapy. (*Id.*)

On March 8, 2016, petitioner was seen for an occupational therapy evaluation at Health Care Associates in Medicine. (Ex. 3, pp. 17-18.)  Petitioner's chief complaint was pain and stiffness. (Ex. 3, p. 17.)  She reported pain of 7-8 on a 10 point scale along with decreased range of motion. (*Id.*)  Petitioner's plan included six weeks of therapy 2-3 times per week and a home exercise plan. (Ex. 3, p. 18.)  Her therapy goals included reducing her pain by a single grade and increasing range of motion by 20%. (Ex. 3, p. 17.)

Beginning March 15, 2016, petitioner attended occupational therapy. (Ex 3, pp. 11-16.)  Petitioner was noted to tolerate her treatment well; however, on March 29, 2016, it was noted that petitioner reported that "I don't do as much at home" and petitioner was strongly encouraged to perform her home exercise plain daily. (Ex 3, p. 15.)  Notations in petitioner's therapy records initially indicate subjective reports of pain with certain movements. (*Id.*, pp. 14-15.)  On March 31, 2016, she reportedly indicated that her shoulder "still hurts a lot." (*Id.*, p. 15.)

---

[4] Petitioner's chiropractic record reported diagnosis codes of M54.2 and M62.830. (Ex. 2, p. 3.) Respondent represents that these diagnoses are cervicalgia and muscle spasms of the back respectively. (ECF No. 34, p. 2, n 3.)

[5] In her affidavit, petitioner discussed her difficulty in making arrangements to pursue physical therapy, intimating that this caused her to go less often and bear more of her pain. (Ex. 9.)  However, there are no records in this case marked as physical therapy records.  Petitioner is likely referring to the occupational therapy she pursued from March 8, 2016 to May 3, 2016 at the later recommendation of her orthopedist. (Ex. 3, pp. 11-17.)  The home exercise plan mentioned in petitioner's affidavit is the one recommended by her physical (or occupational) therapist. (Ex. 9.)

During April of 2016, petitioner reported to her occupational therapist that it was difficult to move her arm due to pain (April 4, 2016) and that her pain had increased since trying new exercises (April 11 and April 19, 2016). (*Id.*)  On April 13, 2016, petitioner returned to Dr. Reilly. (Ex. 3, p. 7.) Dr. Reilly noted that petitioner "[r]eally is not seeing any improvements in motion" and recommended an MRI. (*Id.*)  However, Dr. Reilly made no notation regarding petitioner's pain.

An MRI was conducted on April 28, 2016.  It showed "[m]inimal non-specific curvilinear edema in the supraspinatus musculotendinous junction abutting the superior joint capsule may reflect musculotendinous junction strain or non-specific capsular inflammation."  (Ex 3, p. 21.)  There was no evidence of rotator cuff tear and no drainable collection or joint effusion.  The superior labrum appeared to be preserved. (*Id.*)

On May 3, 2016, petitioner elected to discontinue her occupational therapy treatment. (Ex. 3, p. 11.)  In total, she attended 11 occupational therapy sessions. (Ex. 3, pp. 11-16.)

On May 25, 2016, petitioner returned to Dr. Reilly.  (Ex. 3, p. 7.)  At that time, Dr. Reilly noted that petitioner was "making good progress," but that she still had "some mild restrictions in motion." (*Id.*)  Petitioner reported an interest in continuing physical therapy,[6] but Dr. Reilly concluded that she had made sufficient progress such that manipulation of the shoulder was not necessary.  Dr. Reilly noted that petitioner "is more comfortable."  (*Id.*) Petitioner was to return on an as needed basis. (*Id.*)

No further treatment records were filed in this case; however, petitioner averred that "[m]y shoulder pain started to improve by the end of 2016" but that "]w]hile my shoulder pain has improved, almost 2 and a half years later, I still have pain.  I cannot fully stretch up my left shoulder. I also cannot twist my left arm because of a dull pain." (Ex. 9, p. 2.)  Petitioner further indicated that "[a]s a result of my ongoing shoulder pain, discomfort and decreased range of motion, I am unable to lift heavy things with my left arm, have difficulty putting on a jacket, cannot reach behind my back with my left arm, and care barely touch the end of my right shoulder with my left hand." (*Id.*)

Petitioner further averred that the period from her injurious vaccination until the end of 2016 was a "really hard time" that was both physically and emotionally painful. (Ex. 9, pp. 1-2.)  Petitioner indicated that caring for her 3-month old son was "inexplicably difficult, painful, and frustrating" due to her frozen shoulder. (Ex. 9, p. 1.) She indicated that her pain and stress caused her to sometimes become visibly upset with her son and "very harsh."  (*Id.*)  She indicated that she was easily irritated, angry, depressed and frustrated. (*Id.*)

---

[6] However, as noted above, petitioner had previously elected to discontinue her therapy. (Ex. 3, p. 11.)  In her affidavit, petitioner suggested that the cost of therapy and her inability to secure child care were factors limiting her ability to attend.  There is no evidence to suggest that she ever resumed her therapy. In her affidavit, petitioner expressed an interest in pursuing acupuncture, but there is no evidence that she followed up on that treatment. (Ex. 9.)

### III.    Party Contentions

Petitioner argues that she should be awarded $95,000.00 (ECF No. 33, p. 6.)  In support of this contention, petitioner cites four prior cases wherein petitioners experiencing SIRVA were awarded compensation ranging from $80,000.00 to $101,316.64.  (*Id.*, pp. 4-6.)  Three of the cited cases were proffered by the government.[7]  The fourth case, *Desrosiers*, was decided by the undersigned.  In that case, petitioner was awarded $85,000.00 for her pain and suffering. (*Id.*, pp. 4-5.)

Petitioner notes that, like the petitioner in *Desrosiers*, petitioner was caring for an infant son during her period of injury.  Unlike *Desrosiers*, where the final physical evaluation revealed no tenderness and full range of motion, petitioner notes that her final evaluation revealed an ongoing restriction in range of motion which she continues to suffer. (ECF No. 33, pp. 5-6.)  In sum, petitioner argues that her "left shoulder injury caused significant pain, painful rehabilitation, left her sleep deprived, financially burdened and emotionally frustrated that she missed out on valuable time with her 3 month old son.  Ms. Kim's left shoulder injury continues to impact her quality of life and emotional well-being." (ECF No. 34, p. 6.)

In response, respondent contends that an award of $55,000.00 for petitioner's pain and suffering is more appropriate. (ECF No. 34, p. 6.)  Respondent contends that "[p]etitioner's medical records reflect that she sustained a mild left shoulder injury, of limited duration, without longstanding sequela." (*Id.*)  Respondent stresses that petitioner's treatment timeline includes significant gaps and that her occupational therapy was discontinued at her own election. (*Id.*)  Respondent also notes that petitioner was deemed to be "making good progress" after only seven months and was at that time instructed to return on an as needed basis.  No cortisone injections were administered and petitioner did not undergo surgery or other procedures. (*Id.*)

Respondent further stresses that there are no medical records filed in this case beyond May 25, 2016, and that petitioner's allegations of ongoing difficulties are not substantiated beyond her own affidavit. (ECF No. 34, p. 7.)  Respondent notes that other petitioners have provided circumstantial evidence to support these types of allegations. (*Id.* citing *Marino v. HHS*, 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018).)

Respondent argues that *Desrosiers* is distinguishable, because the amount awarded in that case (which is less than petitioner requests in this case) was based in significant part on extenuating circumstances related to that petitioner's pregnancy.  Respondent also contends that the treatment history in *Desrosiers* was more extensive and complicated than in this case.  Respondent also asserts that the three proffers cited

---

[7] These cases are as follows*: Lagamma v. HHS*, 17-219V (government proffered $90,600.00 in damages); *Benincasa v. HHS*, 16-179V (government proffered $101,316.64); and *Stendal v. HHS*, 15-969V (government proffered $80,000.00).  For privacy reasons, the undersigned will not discuss the factual summaries of these cases as represented by petitioner.

by petitioner were not limited to pain and suffering and that the medical histories in those cases were distinguishable. (ECF No. 34, pp. 7-9.)

Respondent asserts that the case of *H.S. v. HHS*, 14-1057V, 2015 WL 6155891 (Fed. Cl. Spec. Mstr. Sept. 25, 2015), is instructive.  In that case, petitioner, a high school student, experienced a skull fracture which left him in a neck brace for six weeks and unable to participate in play or sports for more than a year. He was awarded $60,000.00.  (ECF No. 34, p. 9.)  Respondent contends petitioner's injury is less severe than the injury in H.S. (*Id.*)

## IV.    Standard for Assessing Pain and Suffering

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. HHS*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).  Medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on her daily life.  *Shapiro v. HHS*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.")

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See I.D. v. HHS,* No. 04- 1593V, 2013 WL 2448125 at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. HHS*, No. 93-172V, 1996 WL 300594 at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation").  Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *See I.D.*, 2013 WL 2448125, at *9; *McAllister v. HHS,* No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995).

## V.    Pain and Suffering Awards in Prior SPU SIRVA Cases

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering this case. *See, e.g. Jane Doe 34 v. HHS*, 87 Fed. Cl. 758, 768 (July 15, 2009)(finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.")  And, of course, the undersigned also may rely on her own experience adjudicating similar claims.[8] *See Hodges v. HHS*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual

---

[8] From July 2014 until September 2015 the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases have remained on the undersigned's docket.

claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  *See Graves v. HHS*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  Judge Merrow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  *Graves*, 109 Fed. Cl. at 590.  Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  *Id.* at 595.

In that regard, the undersigned notes that over the past four years, the Special Processing Unit has amassed a significant history regarding damages in SIRVA cases.  This includes hundreds of prior cases resolved via informal resolution as well as five prior reasoned decisions by the undersigned awarding damages.  Balancing the above considerations, this information provides valuable context.

### A. SIRVA Damages in prior SPU cases resolved via settlement or proffer[9]

As of July 1, 2018, 864 SIRVA cases have informally resolved[10] within the Special Processing Unit since its inception in July of 2014.  Of those cases, 541 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[11]  Additionally, 309 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $77,500.00 to $125,000.00.[12]  The median award is $100,000.00.  In most instances, these awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering.

---

[9] Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims website by keyword and/or by special master.  On the court's main page, click on "Opinions/Orders" to access the database.  All figures included in this decision are derived from a review of the decisions awarding damages within the SPU.  All decisions reviewed are, or will be, available publicly.  All figures and calculations cited are approximate.

[10] Additionally, 27 claims alleging SIRVA have been dismissed within the SPU.

[11] Additionally, there have been 14 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[12] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist.  The full range of awards spans from $25,000.00 to $1,845,047.00.  Among the 14 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $122,886.40. For these awards, the second and third quartiles range from $89,250.00 to $162,876.80.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $95,228.00.[13]  The median award is $71,355.26.  As with proffered cases, in most instances, stipulated awards are presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering.  Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

These figures represent four years' worth of *past* informal resolution of SIRVA claims and represent the bulk of prior SIRVA experience in the Vaccine Program.  However, these figures are subject to change as additional cases resolve and do not dictate the result in this or any future case.  Nor do they dictate the amount of any future proffer or settlement.

### B. Published decisions awarding damages in prior SPU SIRVA cases

Additionally, since the inception of SPU in July 2014, there have been five reasoned decisions by the undersigned awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages.  Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.  These decisions are:

- *Desrosiers v. Sec'y Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); and

- *Dhanoa v. Sec'y Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $94,900.99 for pain and suffering and $862.14 in past unreimbursable medical expenses); and

- *Marino v. Sec'y Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); and

- *Knauss v. Sec'y Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); and

---

[13] Typical range refers to cases within the second and third quartiles.  Additional outlier awards also exist.  The full range of awards spans from $5,000.00 to $509,552.31.  Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

- *Collado v. Sec'y Health & Human Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursed medical expenses).

## VI.    Discussion

### A.  Determining Petitioner's Award in This Case

Upon the undersigned's review of the complete record in this case and in consideration of the undersigned's experience evaluating SIRVA claims, petitioner appears to have suffered a shoulder injury that was relatively mild.  That is, the available evidence demonstrates that petitioner's injury was not severe and that the period of her recovery was not prolonged.

Although petitioner periodically provided subjective reports of severe levels of pain (7, 8, or 10 out of 10),[14] the undersigned finds significant the fact that during the first four and a half months following her injurious vaccination she sought only one chiropractic consultation and there is no evidence that petitioner pursued any of the recommended follow up care at that time.[15]  Later, she was characterized as making "good progress" with only "mild restrictions of motion" after only three months of orthopedic care and occupational therapy.  At that time, she was characterized as "more comfortable." Petitioner elected herself to discontinue her occupational therapy after only about a month and a half of therapy, and although her final medical record reports an interest in continuing that therapy, there is no evidence that she did so.  As a whole, the medical records suggest a period of significant pain lasting approximately seven months.

Moreover, once petitioner did seek orthopedic care, her MRI study revealed only minimal non-specific curvilinear edema in the supraspinatus musculotendinous junction.  Additionally, there is no evidence in the record to suggest that petitioner's orthopedist considered her condition severe enough to recommend any steroid injection treatment and the orthopedist ultimately concluded after only two to three months of active treatment that surgery was unnecessary.

To the extent petitioner has averred that she has ongoing pain and limited range of motion two and a half years later, this is not well substantiated in the record of the

---

[14] Specifically, petitioner reported pain of 7-8 out of 10 to her chiropractor on November 24, 2015, (Ex. 2, p. 3) when she first sought treatment.  (Ex. 2, p. 3.)  She scored her pain at 10 out of 10 on March 2, 2016 (Ex. 3, p. 7) at her initial orthopedic evaluation, but later reported pain of 7-8 out of 10 when she presented for her occupational therapy evaluation on March 8, 2016 (Ex. 3, p. 17).

[15] The undersigned has repeatedly held that a delay in seeking treatment for a SIRVA does not necessarily defeat petitioner's claim on causation, but that it is a relevant consideration in determining the degree of petitioner's pain and suffering. *See, e.g. Marino*, 2018 WL 2224736, at *8 (stating that "[t]he fact that Ms. Marino delayed seeking treatment is relevant to the value of her claim, [but] does not defeat her claim."); *accord Cooper v. HHS*, No. 16-1387V, 2018 WL 1835179 (Fed. Cl. Spec. Mstr. Jan. 18, 2018 (noting that "the undersigned does not find a delay in treatment of several months to be dispositive in and of itself regarding the question of onset in a SIRVA case such as this.").

case.  As noted above, petitioner's most recent medical record does acknowledge "some mild restrictions in motion;" however that record is more than two years old and also acknowledged that after only a few months of treatment, petitioner was "making good progress" and "is more comfortable."  Moreover, petitioner's affidavit also suggests that she made additional progress subsequent to that medical visit.  She averred that her shoulder pain improved, albeit allegedly incompletely, by the end of 2016.  (Ex. 9, p. 2.)  As of May 25, 2016, petitioner's orthopedist recommended only "as needed" follow up and there is no evidence that petitioner ever returned.  Thus, petitioner's claim of ongoing shoulder pain and limited range of motion are not adequately supported on this record.

The undersigned does note, however, that some additional (non-medical) mitigating factors are present in this case.  Petitioner has credibly described her physical difficulty in raising a three month old child while experiencing pain and limited range of motion in her shoulder as well as the emotional toll of this added stress.  Additionally, petitioner has suggested in her affidavit that the financial burden of seeking care, and a lack of medical insurance, has created a barrier to her treatment.  Although this allegation has not been adequately substantiated, the undersigned is mindful that not all petitioners have equal access to care and that a patient's course of treatment is not always coextensive with her degree of pain and suffering.

Nonetheless, it is also true, as noted above, that medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on her daily life.  *Shapiro v. HHS*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.").  The paucity of relevant treatment records in this case leaves valuation of petitioner's pain and suffering challenging.  *See, e.g. Marino*, 2018 WL 2224736, at *8.  Moreover, for the reasons described above, notwithstanding petitioner's assertion that she pursued less than complete treatment of her injury, those records which do exist are not suggestive of a severe or prolonged injury.

In light of all of the above and based upon review of the entire record, including the parties' briefs, the undersigned concludes that $75,000.00 represents a fair and appropriate award for petitioner's past pain and suffering and that no award for future pain and suffering is appropriate in this case.  This award considers the nature of petitioner's SIRVA as evidenced by her medical records and course of treatment (that is, a period of significant pain initially, but lasting no more than seven months and then improving) as well as the other factors contributing to her overall circumstances, including most notably her difficulty in caring for an infant son while suffering her SIRVA.

## B. Placing Petitioner's Award in the Context of Prior Cases

Petitioner's request for a higher award relies in significant part on citation to three prior awards proffered by the government in earlier SIRVA cases ranging from $80,000.00 to $101,316.64.  (ECF No. 33, p. 4-5 (citing *Lagamma*, *Benincasa*, and *Stendal*).)   In prior decisions, the undersigned has considered proffered amounts from

prior cases as "a frame of reference" when deciding SIRVA damages in the absence of available reasoned decisions.  *See, e.g. Desrosiers*, 2017 WL 5507804, at *5. However, such citations are largely unpersuasive in this case.  Petitioner's comparison to the cited cases are vague and superficial.  In each instance, petitioner provided a brief summary of the other case, including the age of the petitioner, any prior shoulder conditions, the diagnosis, and the number of orthopedic and physical therapy visits.  In no instance did petitioner provide any information regarding an individual petitioner's reports of pain through the course of treatment or the physicians' or therapists' impressions regarding the condition or progress of these other petitioners throughout their course of treatment.  Thus, the summaries provided in petitioner's brief are inadequate to reliably compare the awareness, severity, and duration of each petitioner's suffering.

And while the undersigned appreciates the rationale behind citing selected prior proffered awards, the usefulness of these citations *without more* is minimal.  This approach has several significant limitations and becomes less persuasive as additional reasoned decisions become available.  First, as noted above, awards based on stipulations and proffers may include additional elements of damages, such as lost wages or medical expenses, that are not clearly communicated by the negotiating parties.  Moreover, notwithstanding the representations made in the party briefs regarding the merits of these prior cases, the facts of these individual cases are not a part of the record of this case nor are they disclosed in the cited decisions.[16]  Third, the scale of the above-discussed history of prior SPU SIRVA awards (864 such awards in four years) is such that petitioner's three citations, even assuming *arguendo* that they are very well matched to the facts of the instant case, necessarily represent "cherry picking."  Relatedly, petitioner's review of prior cases appears to have been limited to those cases previously negotiated by her own counsel, rather than the whole of prior SIRVA experience within the Office of Special Masters.

Rather, to the extent prior informal resolutions are to be considered, the undersigned finds that the overall history of informal resolution in SPU provides a more valuable context for assessing the damages in this case. Since it reflects a substantial history of resolutions among many different cases with many different counsel, the undersigned is persuaded that the full SPU history of settlement and proffer conveys a better sense of the overall arms-length evaluation of the monetary value of pain and suffering in a typical SIRVA case.[17] As noted above, that history places the low end of proffered SIRVA damages (i.e. the bottom quarter of cases) at between $25,000.00 and $77,500.00 and the median at $100,000.00.[18]  In stipulated cases, these amounts are even lower.

---

[16] Pursuant to §12(d)(4)(A) "information submitted to a special master or the court in a proceeding on a petition may not be disclosed to a person who is not a party to the proceeding without the express written consent of the person who submitted the information."

[17] This approach is also not without limitations.  For example, it does not resolve the concern that some awards include undisclosed amounts for expenses or lost wages.

[18] These amounts do not represent a continuum of severity for pain and suffering (indeed the facts underlying each award are not disclosed), but rather provide accumulated evidence of the amounts

The undersigned's award here is based on the record evidence and also finds added support in the overall history of SIRVA resolution within the SPU.  Moreover, the undersigned's award in this case is also consistent with prior reasoned decisions awarding damages in SIRVA cases.  *See Marino*, 2018 WL 2224736 (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Knauss*, 2018 WL 3432906 (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses).[19]

The undersigned is not persuaded by petitioner's reliance on *Desroisers* as being a comparable case.  Unlike the instant petitioner, the petitioner in *Desroisers* sought treatment on a consistent basis.[20]  As described above, petitioner in this case waited over one month before seeking any consultation regarding her shoulder, then waited again more than three months thereafter before seeking any further care.  While the record in *Desroisers* showed active treatment of petitioner's injury for seven to eight months, medical records in this case reflect only two to three months of active, ongoing treatment from early March to late May of 2016.  And while both Ms. Kim and Ms. Desroisers described additional difficulties due to the impact of their shoulder condition on the care of their infant children, a further significant factor in Ms. Desroisers's case was that she was also pregnant at the time.  This left her unable to utilize prescription medications, steroid injections, or surgery.  2017 WL 5507804, at *5.  In this case, over the course of her treatment, Ms. Kim filled two prescriptions for Maloxicam (Ex. 1, p. 7) and was not ultimately recommended either steroid injections or surgery.  Petitioner's injury does not appear to have been as severe as in *Desroisers* and her overall circumstances less impactful of her pain and suffering.[21]

## VII.   Conclusion

In light of all of the above, **the undersigned awards** the following compensation:

**A lump sum of $75,520.00 (representing $75,000.00 for petitioner's actual pain and suffering and $520.00 for unreimbursable medical expenses) in**

---

awarded in prior SIRVA cases, necessarily reflecting at least in part a valuation placed on pain and suffering by parties over time and in many cases.  *See Graves, supra*.

[19] The *Knauss* decision had not yet been issued at the time petitioner submitted her opening brief.  The undersigned notes only that her determination in this case is consistent with *Knauss*.  The outcome in this case does not turn on the facts of *Knauss* or the result reached in that case.

[20] As described in the decision awarding damages, the *Desroisers* petitioner first sought treatment for her shoulder injury on March 24, 2015, within two weeks of her March 9, 2015 vaccination.  From that point forward, she sought treatment on March 30, April 9, April 16, April 21, April 23, April 28, May 5, May 14, June 1, July 7, August 3, September 21, and October 6.  2017 WL 5507804, at *1-4.

[21] Nor, however, is the undersigned persuaded by respondent's citation to *H.S.*  The high school student in *H.S.* experienced head trauma, concussion, and skull and vertebra fractures. 2015 WL 6155891, at *3.  The undersigned does not find the injury in *H.S.* to be sufficiently analogous to be of significant persuasive value in this case.

**the form of a check payable to petitioner**.  This amount represents compensation for all items of damages that would be available under 42 U.S.C. § 300aa-15(a).  *Id.*

The clerk of the court is directed to enter judgment in accordance with this decision.[22]

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Chief Special Master

---

[22] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.